# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

**RICHARD ADKINS,**

    **Plaintiff,**

    **Civil Action No.: 2:21-cv-00636**
    **Judge: Irene C. Berger**

**v.**

**BIOTE MEDICAL, LLC,**
**WILLIAM JARROD CHAPMAN, D.O., and**
**LIVING WELL MEDICAL CENTER, PLLC,**

    **Defendants.**

## AMENDED COMPLAINT

NOW COMES the Plaintiff, Richard Adkins, by counsel, Brian J. Headley, Esquire, and Headley Ballard, LLC, pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, and files the following Amended Complaint seeking recovery for the personal injuries and damages that the Plaintiff suffered as a result of the negligent conduct of the Defendants. In support thereof, the Plaintiff avers as follows:

## PARTIES

1.    Plaintiff Richard Adkins is an adult individual who resides in Nitro, West Virginia.

2.    Defendant BioTE Medical, LLC ("BioTE"), is a foreign for-profit limited liability company organized and existing under the state laws of Texas with a principal place of business located at West Walnut Hill Drive, Suite 100, in Irving, Texas.

3.    BioTE is authorized to conduct business in the State of West Virginia, regularly and consistently conducts business in the State of West Virginia, and purposefully avails itself of the privileges of transacting business in the State of West Virginia.

1

4.     BioTE describes itself as "the world leader in precision hormone balance and complementary supplements for lifelong vitality and disease prevention."

5.     Through its network of approved medical providers, BioTE delivers hormone therapy and supplements to a variety of patients through its methods of "bioidentical hormone replacement therapy" to patients across the United States.

6.     Specifically, BioTE has supplied and does supply its hormone therapy, supplements, and related programs and medical products to providers and patients in the State of West Virginia.

7.     BioTE's activities within and directed toward the State of West Virginia are sufficiently consistent, purposeful, systematic, and substantial so as to confer general jurisdiction over them by the courts of West Virginia.

8.     Defendant William Jarrod Chapman, D.O., ("Dr. Chapman") is an adult individual and licensed medical professional who lives and works in the State of West Virginia.

9.     Defendant Living Well Medical Center, PLLC ("LWMC") is a West Virginia professional limited liability company that provides health care services to its patients and conducts and transacts business in Kanawha County, West Virginia.

10.    Upon information and belief, Dr. Chapman, a West Virginia citizen, is the only member of LWMC.

11.    LWMC maintains its principal place of business located at 826 Oakwood Road in Charleston, Kanawha County, West Virginia.

12.    At all times relevant to this Complaint, LWMC facilitated and provided medical care and treatment to Richard Adkins through its agents, servants, and/or employees.

13.    At all times relevant to this Complaint, Dr. Chapman was one such agent, servant, and/or employee of LWMC acting within the scope for which he was engaged.

14.    As described more fully below, the Defendants, individually and collectively, engaged in negligent conduct that resulted in severe and permanent injuries to the Plaintiff.

15.    This Court has jurisdiction over the Plaintiff's claims, as the cause of action arose through the negligent actions committed by the Defendants in Kanawha County, West Virginia, thereby conferring specific jurisdiction over each of them.

### FACTS

**A.    Dr. Chapman's Long History of Treating Patients with BioTE Therapy.**

16.    Since as early as 2011, Dr. Chapman, through his own private practice, LWMC, was a "Certified BioTE Legacy Partner" and a BioTE-designated "Trusted Provider."

17.    At all relevant times to this Complaint, Dr. Chapman and certain other agent-employees of LWMC, including, but not limited to Ms. Tina Taylor, attended one or more training seminars put on by BioTE regarding BioTE's hormone therapy programs.

18.    At the BioTE training seminars, Dr. Chapman and one or more LWMC agent-employees such as Ms. Taylor were instructed on how to provide hormone therapy to patients per the guidelines and recommendations of BioTE.

19.    One such hormone therapy that BioTE instructed Dr. Chapman and Ms. Taylor on was BioTE's hormone replacement therapy with pellets ("Pellet Therapy").

20.    As a part of BioTE's Pellet Therapy, small pellets containing hormones are subcutaneously injected into the body by way of a small incision.  The injected hormones are thereafter absorbed and dispersed throughout the body.

21. According to BioTE protocol, when a patient is first evaluated for hormone replacement therapy, his or her blood is drawn and submitted to a third-party company for clinical analysis of various lab panel values. These lab panels are then returned to BioTE's Trusted Providers.

22. Notably, BioTE's hormone therapy program assigns its own suggested "normal" hormone levels.

23. These BioTE standards are often dramatically higher than that what is considered to be "normal" by the generally accepted medical standards (i.e., those that appear as the normal ranges in the results from blood testing laboratories).

24. Because of this discrepancy, nearly all LWMC patients were diagnosed with low Testosterone and therefore considered viable candidates for BioTE hormone therapy.

25. According to the sworn testimony of Ms. Taylor, BioTE further instructed its "Trusted Providers" like Dr. Chapman and LWMC to patently disregard the patient's objective Testosterone lab values.

26. Instead, per Ms. Taylor, BioTE advised its "Trusted Providers" to ultimately render their clinical determinations based solely on the patients' subjective feelings and/or reported side effects of previously-administered BioTE therapies.

27. That is, according to Ms. Taylor, a patient's subjective complaints of any symptoms that may be attributable to low testosterone levels was thereafter treated as such via Pellet Therapy, regardless of the objective levels of Testosterone measured in the individual's blood.

28. As an additional aspect of BioTE's Pellet Therapy program, BioTE also created and maintained an automated online system for its Trusted Providers to utilize.

29. Within that automated online system, Trusted Providers created and thereafter logged individual patient information for those receiving BioTE treatment therapy.

30. Trusted Providers contemporaneously recorded patient information into BioTE's automated online system, which specifically included, but was not limited to, information regarding a patient's clinical history, complaints or symptoms, and historical lab values.

31. Based on the information provided by its Trusted Providers within the BioTE automated online system, BioTE would then provide instructions and specific recommendations on the appropriate course of BioTE treatment for each individual patient.

32. Upon information and belief, Dr. Chapman and other LWMC employees very rarely, if ever, strayed from the autonomous instructions and recommendations populated by the BioTE automated online system. As such, Dr. Chapman and LWMC rarely, if ever, offered their own independent, medical judgment with respect to the general management of each BioTE patient's care.

33. Upon information and belief, BioTE's system failed to notify Dr. Chapman or any other LWMC employee when a patient's hormone levels were abnormally high or when patients were no longer viable candidates for the BioTE hormone therapy programs.

**B. The Defendants Injure Richard Adkins.**

34. At all times relevant to this Complaint, and as early as 2011, Richard presented to Dr. Chapman and LWMC on a regular basis for primary level care.

35. Specifically, Dr. Chapman served as Richard's primary care physician and, in addition to managing Richard's general health and well-being, Dr. Chapman oversaw and treated Richard for a host of issues which included, *inter alia*, cardiac issues and low libido.

36.     As a part of his general patient management, Dr. Chapman ordered blood tests on Richard to check his blood levels on multiple occasions.

37.     Blood test results are well-understood to fluctuate depending on a variety of factors such as the time of day the blood is drawn and whether the patient had fasted prior to the blood sample being taken.

38.     According to the records, Dr. Chapman submitted his lab orders on an inconsistent basis and were taken without regard for the time that the blood was drawn or whether Richard had eaten before the blood draw.

39.     Nonetheless, based on the results of Richard's blood tests and relying on instruction and guidance from BioTE and its hormone therapy system, Dr. Chapman determined that Richard was a viable candidate for hormone replacement therapy.

40.     According to the records, Dr. Chapman placed Richard on the hormone supplement, Androgel, and administered BioTE Pellet Therapy.

41.     With respect to the BioTE Pellet Therapy, Dr. Chapman injected multiple rounds of 2000 milligram BioTE pellet into Richard's hip on numerous occasions.

42.     Throughout the course of Richard's BioTE Pellet Therapy, Dr. Chapman continued to order routine lab work on Richard to review blood levels.

43.     Significantly, Richard's routine lab work revealed that certain blood levels were elevated significantly while he continued to receive the BioTE pellet injections.

44.     For instance, In April 2017, Richard's Testosterone level was recorded at 1455 ng/dl, which was significantly higher than the normal range of 348-1197 ng/dl.  Richard's Estrogen levels also reached 110 pg/mL at that time, which far exceeded the normal range of 7.6 to 42 pg/mL.

45. Neither Dr. Chapman nor BioTE's hormone therapy system altered or otherwise decreased his Testosterone therapy or dosage.

46. To the contrary, Richard was once again injected with the BioTE pellets containing 2000 mg of Testosterone at his next regularly scheduled visit on November 16, 2017.

47. Homeostasis is a naturally occurring bodily function that maintains proportionate levels of various hormones in the body to stay healthy. Generally speaking, this includes proportionate amounts of Testosterone to Estrogen in a male body.

48. The process known as Aromatization is a bodily function that converts Testosterone into Estrogen.

49. Thus, through the Aromatization process, the higher the levels of Testosterone in a male's body, the higher the levels of Estrogen.

50. Men with higher levels of Estrogen in their blood are more likely to develop breast cancer.

51. As a result of the Testosterone therapy provided to Richard by the Defendants for years, Richard maintained consistently excessive levels of Testosterone in his blood.

52. The consistently high levels of Testosterone thus resulted in Richard also maintaining consistently high levels of Estrogen in his blood.

53. In November 2019, Richard was diagnosed with breast cancer as confirmed by a biopsy performed on a mass which had manifested in his breast.

54. Richard developed breast cancer specifically as a result of the improper, inappropriate, unsafe, and unnecessary hormone therapy that he received from Dr. Chapman and per BioTE's hormone replacement Pellet Therapy program.

55. To treat his breast cancer, Richard has endured a mastectomy and grueling chemotherapy sessions.

56. Additionally, Richard had been diagnosed with coronary artery disease before ever beginning to treat with Dr. Chapman, and the records indicate that Richard was clinically obese and had dyslipidemia with high LDL and high triglyceride levels.

57. Testosterone therapy has been recognized as a potential cause of exacerbating heart disease or causing cardiac events.

58. As a result of years of treatment by Dr. Chapman through BioTE's hormone therapy program, Richard suffered a heart attack, and had bypass surgery.

59. Only after the heart attack and bypass surgery did Dr. Chapman finally place Richard on a statin.

60. As a result of the Defendants' individual and collective negligence, Richard suffered a heart attack, underwent bypass surgery, developed breast cancer, and has endured a mastectomy and grueling chemotherapy sessions. Richard has also experienced severe and permanent injuries including, but not limited to, additional and unnecessary medical treatment, extreme pain and suffering, past and future medical expenses, severe emotional distress, embarrassment, humiliation, a loss of life's pleasures, the inability to function as a whole person, and other incidental damages.

61. As provided by West Virginia Code § 55-7B-6, the Plaintiff provided Dr. Chapman and LWMC with notice of this claim and with a screening certificate of merit more than thirty days prior to filing this action.

## COUNT I – NEGLIGENCE
### Plaintiff v. BioTE

62. Plaintiff incorporates Paragraphs 1 through 61 as though set forth fully herein.

63.    At all times relevant to this Complaint, BioTE owed a duty to exercise reasonable care to its consumers, including Richard, in the design, development, manufacture, testing, inspection, promotion, distribution, labeling and/or use of its Testosterone Pellet Therapy program.

64.    At all times relevant to this Complaint, BioTE owed a duty to exercise reasonable care to its consumers, including Richard, and to ensure the safety and efficacy of its products, therapies, and programs.

65.    At all times relevant to this Complaint, BioTE owed a further duty to ensure that all of its "Certified BioTE Legacy Partners" and "Trusted Providers" were appropriately trained and instructed and to ensure that all such providers rendered safe and proper hormone therapies.

66.    BioTE breached its duties to Richard by in numerous ways, which include, but are not limited to, the following:

a. In the negligent design, development, research, promotion, testing, marketing, implementation, and/or distribution of its hormone therapy programs, to specifically include its Testosterone Pellet Therapy hormone replacement program and its attendant automated online system and patient database;

b. In the negligent post-market surveillance of its Pellet Therapy program and online automated patient database which, if properly performed, would have shown that Richard's Testosterone and Estrogen levels were abnormally high and that he was not an appropriate candidate for the BioTE Pellet Therapy program; and

c. In failing to properly train, supervise, and/or otherwise monitor the actions of "Certified BioTE Legacy Partners" and "Trusted Providers," to specifically include Dr. Chapman, LWMC, and all agent-employees of LWMC, who rendered care under the applicable BioTE programs.

67.     BioTE knew or should have known that the end-users of its programs and products, such as Richard, would foreseeably suffer injuries from the Defendants' failure to exercise reasonable and ordinary care.

68.     As a direct and proximate cause of BioTE's actions and inaction, Richard suffered the injuries and damages as previously described herein.

69.     BioTE's conduct was willful, wanton, and displayed a level of indifference to Richard's health and well-being such that an award of punitive damages is appropriate.

## COUNT II – FAILURE TO WARN
### Plaintiff v. BioTE

70.     Plaintiff incorporates Paragraphs 1 through 69 as though set forth fully herein.

71.     BioTE receives compensation for every patient who is enrolled in its Pellet Therapy program.

72.     BioTE is compensated for every individual treatment received through its Pellet Therapy program.

73.     BioTE has engaged in the business of selling, distributing, supplying, marketing, and/or promoting its Pellet Therapy program and, through that conduct, has knowingly and intentionally placed such programs into the stream of commerce with full knowledge that its product reaches consumers such as Richard.

74.     BioTE did, in fact, sell, distribute, supply, market, and/or promote its Pellet Therapy program to Richard through BioTE's "Trusted Providers," including Dr. Chapman and LWMC.

75.     Additionally, BioTE expected that its Pellet Therapy program would reach – and in fact did reach – prescribing physicians and consumers, including its own "Trusted Providers" as

10

well as Richard, without any substantial change in the condition from when it was initially distributed by BioTE.

76.     At all times relevant to this Complaint, the BioTE Pellet Therapy program, and specifically, its automated online system, was defective and unsafe in design and/or implementation such that it was unreasonably dangerous to the end-user and was so at the time it was distributed by BioTE and otherwise administered to Richard.

77.     The defective condition of BioTE's automated online system was due in part to the fact it was not equipped or otherwise programmed to provide appropriate warnings regarding unsafe and abnormally high Testosterone and Estrogen levels in its patients.

78.     This defect caused serious injuries to Richard, who utilized the BioTE hormone therapy program in its intended and foreseeable manner.

79.     At all times relevant to this Complaint, BioTE had a duty to properly design, test, distribute, maintain, and otherwise implement proper warnings within its programs and take steps to assure that its programs did not cause users such as Richard to suffer from unreasonable and dangerous side effects.

80.     BioTE negligently and recklessly designed, tested, distributed, maintained, and implemented its Pellet Therapy program in a manner that was dangerous and unsafe for the use and purpose for which it was intended.

81.     BioTE knew or should have known of the probable consequences of its aforementioned conduct, but it willfully and deliberately failed to avoid the consequences associated with its failure to warn, and acted with conscious disregard for the safety of Richard.

82.     Richard could not have discovered any defect in the BioTE Pellet Therapy program through the exercise of reasonable care and he reasonably relied upon the skill, superior knowledge, and judgment of the Defendants.

83.     As a direct and proximate cause of BioTE's actions and inaction, Richard suffered the injuries and damages as previously described herein.

84.     BioTE's conduct was willful, wanton, and displayed a level of indifference to Richard's health and well-being such that an award of punitive damages is appropriate.

**COUNT III – STRICT PRODUCTS LIABILITY**
**Plaintiff v. BioTE**

85.     Plaintiff incorporates Paragraphs 1 through 84 as though set forth fully herein.

86.     The Pellet Therapy program manufactured, marketed, supplied, and/or distributed by BioTE was defective at the time of manufacture, development, production, testing, inspection, endorsement, sale, distribution, and in those warnings, instructions, and directions accompanying such programs failed to warn of the dangerous risks it posed.

87.     At all times relevant to this Complaint, the Pellet Therapy program manufactured, developed, endorsed, distributed, and otherwise implemented by BioTE was defective, and BioTE knew that its Pellet Therapy program was to be used by consumers without inspection for defects.

88.     The design of the BioTE Pellet Therapy program was defective in that it failed to notify and otherwise appropriately restrict the continued utilization of its Pellet Therapy when its automated online system became aware that patients such as Richard exhibited both dangerous and abnormally high and dangerous levels of Testosterone and/or Estrogen.

89.     The defective design of the BioTE Pellet Therapy program as described above and its associated risks did not outweigh any benefits of its design.

90.     The defect in design existed when the product was first implemented by BioTE.

12

91.    At the time the Pellet Therapy program was implemented, BioTE knew or should have known the risks associated with its defective design.

92.    As a direct and proximate cause of BioTE's actions and inaction, Richard suffered the injuries and damages as previously described herein.

93.    BioTE's conduct was willful, wanton, and displayed a level of indifference to Richard's health and well-being such that an award of punitive damages is appropriate.

## COUNT IV – MEDICAL NEGLIGENCE
### Plaintiff v. Dr. Chapman and LWMC

94.    Plaintiff incorporates Paragraphs 1 through 93 as though set forth fully herein.

95.    Dr. Chapman owed Richard a duty to exercise appropriate medical care and caution and to treat him in a manner consistent with the applicable standard of care.

96.    Dr. Chapman breached the applicable standard of care by failing to appropriately determine Richard's viability as a proper candidate for BioTE Pellet Therapy and by repeatedly subjecting him to the same on multiple occasions.

97.    Dr. Chapman further breached the standard of care by administering Richard numerous rounds of BioTE Pellet Therapy when Dr. Chapmen knew or should have known that Richard's Testosterone levels were markedly higher than the appropriate level for a male.

98.    Dr. Chapman further breached the standard of care by failing to properly manage Richard's heart disease and, to the contrary, by providing Testosterone therapy known to exacerbate or cause cardiac events.

99.    Dr. Chapman is personally liable for his tortious conduct.

100.    LWMC is also vicariously liable for the tortious conduct of Dr. Chapman, Tina Taylor, and all other LWMC employees who operated in the fashion as described above.

101.    LWMC was further independently negligent in allowing the BioTE hormone therapy program to operate in the fashion that it was from LWMC's facility as described above.

102.    Due to LWMC's negligence and that of its employees, Richard suffered the injuries and damages as previously described herein.

103.    The conduct of both Dr. Chapman and LWMC was willful, wanton, and displayed a level of indifference to Richard's health and well-being such that an award of punitive damages is appropriate.

## CONCLUSION

WHEREFORE, the Plaintiff prays that this Honorable Court award him damages in excess of the jurisdictional minimums of this Court and in an amount sufficient to compensate him fully for his injuries as set forth herein, including an award of attorney's fees, costs, expenses, punitive damages, and such other relief as the court deems necessary.

**THE PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY.**

Respectfully submitted,

/s/ Brian J. Headley

By:    _____

Brian J. Headley, Esquire
W. Va. I.D. No. 9667
Jonathan K. Matthews, Esquire
W. Va. I.D. No. 13228
**HEADLEY BALLARD LLC**
297 Seven Farms Drive, Suite 302
Daniel Island, SC 29492
Tel.: (843) 375-6181
Fax: (843) 375-6185
*Counsel for Plaintiff*

14